IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| Stephen Henry, ) | |
| ) | |
| Mr. Henry, ) | |
| ) | |
| vs. ) | Cv. No. 3:12-cv-1282 |
| ) | Magistrate Judge Brown by consent |
| Federal Reserve Bank of Atlanta. ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM**

### **I.  INTRODUCTION AND BACKGROUND**

The facts presented here for summary judgment are simple and succinct. The Federal Reserve Bank of Atlanta ("the Bank") operated a branch in Nashville, Tennessee until July 31, 2011. (Defendant's Statement of Material Fact ("DSMF"), DE 34-1, p. 1 ¶ 2.) Stephen Henry ("Mr. Henry") was employed by the Bank in its law enforcement department from December of 2004 until May 31, 2011. (DSMF at pp. 1-2 ¶¶ 3-4.) During his tenure there, Mr. Henry's fitness and performance evaluations were exemplary. (Plaintiff's Statement of Material Fact ("PSMF") at pp. 5-7 ¶¶ 10-17.) In February of 2008, Mr. Henry was promoted to Sergeant, a lower management position in the law enforcement department, and had many responsibilities in addition to being a law enforcement officer. (PSMF at pp. 4 ¶¶ 7-8.) These responsibilities included repairing and maintaining fire arms, being a first responder, and a position on the Bank's pistol team. (PSMF at pp. 4 ¶¶ 7-8.)

Mr. Henry is concededly an "extremely religions" individual. When greeting others, Mr. Henry often responded that he was blessed, he displayed an Israeli flag in his automobile, kept religious symbols in his locker, and attended a faith based University. (PSMF at pp. 25-26 ¶¶ 70-73.) Indeed, Mr. Henry's religious convictions were apparent in his professional life. He did

not condone or tolerate typical "law enforcement culture," he avoided interactions with his co-workers where off color jokes or negative comments were made, and his religious beliefs "mandated" that he correct and reprimand subordinates and peers in order to enforce the Bank's policies as informed by the tenets of his faith. (Complaint, DE 1, p. 4-5 ¶¶ 25-29.) As a result, Mr. Henry's otherwise stellar performance evaluation from 2010 was punctuated by a comment that Mr. Henry was "rigid" during "interpersonal exchanges." (PSMF at p. 9-10 ¶¶ 24, 26.)

Over time, Mr. Henry noted an increase in tensions with his co-workers. Mr. Henry returned from paid time off in early 2011 and claimed that some shirts left on top of his locker may have been moved. Mr. Henry observed that Chief Nalley, Mr. Henry's commanding officer, appeared upset when Mr. Henry reported that he would not attend a pistol team breakfast, and, later, stared at him when Mr. Henry entered a room. Likewise, Mr. Henry overheard comments by one lieutenant that gave Mr. Henry the impression that plans were being made to wreck his car, yet another lieutenant stared at him as Mr. Henry entered the room, and some individuals had drawn their middle finger across their forehead when being addressed by Mr. Henry. Lastly, at some point in 2011, Chief Nalley told Mr. Henry that he was intimidating. (Defendant's Memorandum in Support of Summary Judgment ("Defendant's M"), DE 30-2, p. 8-9.)

In June of 2010, the Bank announced plans to the Nashville branch staff that it would cease operations by the middle of 2011. (DSMF at p. 2 ¶ 7.) Nearly all of the branch's staff, including those individuals in the law enforcement department, would undergo an involuntary separation.[1] (DSMF at pp. 2-3 ¶ 8.) The Bank finalized its closure plans in January of 2011,

---

[1]  Mr. Henry denies that nearly all of the Bank's Nashville staff would be separated from service. However, the basis asserted for the denial is that some officers were allowed to stay on beyond the July 31, 2011 for retirement benefit vesting purposes and three other employees transferred to other branches. (DSMF at pp. 3,

including plans to augment the "Bank's Involuntary Separation Policy" such that all separated employees would receive a "minimum of six months' severance" pay. (DE 36.)

In August of 2010, Mr. Henry requested accommodation of his religious beliefs and his desire to conduct a religious ministry during his off hours. (DSMF at p. 3 ¶ 10.) According to the record, Mr. Henry requested that he not be contacted at home "unless a clear operational need existed which could not wait until he returned to duty, and that appropriate personnel be notivied so that no one would inadvertently call and interrupt [his] ministry." (PSMF at p. 11 ¶ 29.) The Bank agreed to Mr. Henry's request and notified him as such via email, and Chief Nalley verbally agreed to this request. (DSMF at p. 4 ¶ 11; PSMF at p. 11-12 ¶¶ 28-29, 32.) In subsequent requests, Mr. Henry asked that his co-workers refrain from asking about his wife, children, and personal life, or from commenting on Mr. Henry's admiration of firearms. (PSMF at p. 17 ¶ 46.) According to Mr. Henry, these comments were accusations of covetousness and sin, which are offensive to his religious views. (PSMF at p. 17 ¶ 46.)

Despite the Bank's concession, an officer in Mr. Henry's chain of command called his home on December 15, 2010, to inquire about Mr. Henry's shirt size for a pistol team T-shirt. (DSMF at p. 4 ¶ 12.) The individual left a voicemail for Mr. Henry, which Mr. Henry later returned. (DSMF at p. 4 ¶ 12.) In response to Mr. Henry's complaints over the telephone call, the Bank's district EEO officer confirmed that Mr. Henry was not to be called during his off time unless there was an operational need. (DSMF at p. 13 ¶¶ 34-35.) Despite Mr. Henry's renewed request, another of Mr. Henry's co-workers called his home late on the evening of March 21, 2011, to inform Mr. Henry of a last minute change in uniform for the next day. (DSMF at p. 5-6 ¶¶ 15-16.) Mr. Henry's wife answered the telephone and handed the receiver to Mr. Henry once

---

11 ¶¶ 8, 35.) Even in a light most favorable to Mr. Henry, these few occurrences do not undermine claims that "nearly all" employees would be subject to involuntary separation.

the individual identified himself. (DSMF at p. 5-6 ¶¶ 15-16.) Again, Mr. Henry objected to the call via email on March 22, 2011 and through the Bank's EEO officer on March 29th. (PSMF at pp. 14-15 ¶¶ 37-38.)

Believing that it had "adequately and appropriately responded to Mr. Henry's concerns," the Bank contracted with an outside mediator—Critical Response Associates. (DSMF at p. 6 ¶ 19.) On April 1, 2011, Ms. Carol Beavers met with Mr. Henry and listened to his reports of "unusual job tensions, malice, and bad faith." (DSMF at p. 7 ¶ 20.) As a result, Mr. Henry was placed on paid administrative leave pending an investigation. (DSMF at p. 7 ¶ 21.) On April 6, 2011, Ms. Beavers subsequently recommended that Mr. Henry remain on paid administrative leave until the Bank's planned closure date of July 31, 2011, and the Bank ultimately decided to accept and implement that recommendation. (DSMF at p. 8 ¶¶ 22-23.) Mr. Henry was informed of this new occurrence on April 6th or 7th of 2011. (DSMF at p. 9 ¶ 25.) In response, Mr. Henry filed a complaint with the Bank's EEO hotline on April 7, 2011, alleging religious discrimination. (DSMF at p. 9 ¶ 26.) The Bank was unable to confirm Mr. Henry's complaint through its investigation and informed plaintiff as such on May 17, 2011. (DSFM at p. 10 ¶ 29.)

On May 18, 2011, Mr. Henry filed claims of religious discrimination with the Equal Employment Opportunity Commission. (PSMF at p. 24 ¶ 67.) On May 31, 2011, Mr. Henry received notice from the Bank that he was being separated from service effective that date. (PSMF at p. 25 ¶ 68.) The separation notice provided that Mr. Henry would receive his full pay and benefits through July 31, 2011, the planned closure date, and would receive the same severance package as all other involuntarily separated employees. (PSMF at p. 25 ¶ 68; DSMF at pp. 10-11 ¶ 30-31.) However, the severance package offered to Mr. Henry included a waiver that, while not requiring Mr. Henry to forego existing or future EEOC claims, required Mr.

4

Henry to "waive [his] right to recover monetary or other damages" from those claims. (PSMF at p. 25 ¶ 68.) Mr. Henry refused to sign the waiver. (DSMF at p. 10 ¶ 31.)

On June 7, 2011, Mr. Henry filed a charge of retaliation against the Bank with the EEOC. (PSMF at p. 33 ¶ 93.) The EEOC was unable to substantiate Mr. Henry's claims, and, on September 21, 2012, the Commission issued a right to sue letter on those claims. (Complaint, DE 1-1, p. 1.) Mr. Henry filed the instant action in federal District Court for the Middle District of Tennessee on Dec. 7, 2012, alleging claims of hostile work environment and retaliation. (DE 1.) the Bank filed answer on January 14, 2012 (DE 4), and, by Order dated February 1, 2012, the parties consented to Jurisdiction by a U.S. Magistrate Judge. (DE 24.) At the close of discovery, the Bank filed the instant motion for summary judgment on November 11, 2013 (DE 30), to which Mr. Henry filed response on December 27, 2013. (DE 34.) Finally, the Bank filed its reply on January 17, 2014. (DE 37.)

This cause is properly before the Court.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Miller v. City of Calhoun County*, 408 F.3d 803, 812-13 (6th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)). A "genuine issue of material fact" is one which, if proven, could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden rests with the moving party to establish the absence of a factual dispute. *Id.* at 249-50.

In deciding whether summary judgment is appropriate, the court "must look beyond the pleadings and assess the proof to determine whether there is a genuine need for a trial." *Sowards v. Loudon County*, 203 F.3d. 426, 431 (6th Cir. 2000), *cert. denied*, 531 U.S. 875 (2000). In so

doing, the district court must "draw all reasonable inferences in favor of the nonmoving party" in its analysis of the pleadings, affidavits, and record as a whole. *Sadie v. City of Cleveland*, 718 F.3d 596, 599 (6th Cir. 2013) (citing *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Normally, "[t]he moving party need not support its motion with evidence disproving the non-moving party's claim, but need only show that 'there is an absence of evidence to support the non-moving party's case.'" *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

The nonmoving party is not entitled to trial solely on the basis of the pleadings themselves, but must provide more than conclusory allegations, speculation, and unsubstantiated assertions. *See Lujuan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Rather, at the summary judgment stage, the party opposing summary judgment "must present 'affirmative evidence' to support his/her position; a mere 'scintilla of evidence' is insufficient." *Bell v. Ohio State University*, 351 F.3d 240, 247 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). In the context of claims brought under 42 U.S.C. § 1983, the evidence relied upon by the nonmoving party must fairly raise a genuine dispute regarding the deprivation of a constitutionally protected interest by an individual or individuals acting under color of state law. *See Miller*, 408 F.3d at 812.

### III. ANALYSIS

### A. PLAINTIFF'S RELIGIOUS DISCRIMINATION CLAIM

"Title VII of the Civil Rights Act of 1964" prohibits employers from discriminating "against any individual . . . because of such individual's race, color, religion, sex, or national origin." *Harris v. Forklift Sys.*, 510 U.S. 17, 20 (1993). To establish a prima facie case of religious discrimination, a plaintiff must:

> show by a preponderance of the evidence: (1) that [he] was a member of a protected class; (2) that she was subjected to unwelcome [religious] harassment; (3) that the harassment was based on [his religion or religious beliefs]; (4) that the harassment unreasonably interfered with [his] work performance by creating a hostile, offensive, or intimidating work environment; an (5) that there is a basis for employer liability.

*Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2007) (relying on *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)).

To substantiate his hostile work environment claims, Mr. Henry must show that his religion is the "but for" cause of any harassing conduct, *Williams v. GMC*, 187 F.3d 553, 565 (6th Cir. 1998) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)), and that conduct was both so "severe or pervasive [as] to create an environment that a reasonable person would find hostile or abusive, and [that Mr. Henry] subjectively regard[ed it] as" such. *Thornton*, 530 F.3d at 455 (quoting *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)). However, even when considering the totality of the circumstances presented in a light most favorable to Mr. Henry, the allegedly harassing conduct cited by Mr. Henry is neither attributable to his religion nor so "severe or pervasive" as to change the conditions of his employment. *Id.* (quoting *Harris*, 510 U.S. at 23).

The only conduct complained of by Mr. Henry is that he received two phone calls at his home after requesting an accommodation for his religious beliefs; that some shirts left atop his locker while off duty may have been moved; that Chief Nally, Mr. Henry's commanding officer, seemed upset with him, referred to Mr. Henry as intimidating, and stared at him as he entered a room; that two lieutenants with whom Mr. Henry worked stared at him or made comments that caused him to believe they wanted to wreck his automobile; some of Mr. Henry's co-workers drew their middle fingers across their forehead when being reprimanded by him; and that Mr. Henry was referred to as "rigid" during interpersonal interactions with coworkers. Each of these

incidents is devoid of any obvious relation to a particular religion or faith, and Mr. Henry does not associate them directly with the tenants of his faith.

Rather, Mr. Henry infers some religious animus on the part of his co-workers from the fact that they know he is extremely religious conjoined with his perceived workplace tensions. However, there must be more than a subjective inference between the conduct of his co-workers and Mr. Henry's faith. *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (affirming ruling from below that "nonprobative" conduct based upon the alleged discrimination may be disregarded); *Lundy v. GMC*, 101 Fed. Appx. 68, 71-72 (6th Cir. 2004) (declining to consider conduct that was "not demonstrated" to reference or be based on religion). While it is well established that Mr. Henry's co-workers knew of his deeply held religious convictions, their conduct has the appearance of being the product of Mr. Henry's intractable demeanor, his desire to avoid unnecessary interactions with them either while on duty or off, his disdain of law enforcement culture, and, most importantly, his attempts to enforce the Bank's policies as Mr. Henry views them through the lens of his faith. Title VII protects Mr. Henry's religious beliefs and the practices his faith mandates, but it does not license Mr. Henry to impose those beliefs on others through a selective application of the Bank's policies.

Even were there some obvious connection between this conduct and Mr. Henry's religion, the incidents cited are not nearly so "extreme [as] to amount to a change in the terms and conditions of employment." *Hafford*, 183 F.3d at 512-13 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). In assessing whether conduct alleged is sufficiently "severe and persuasive" to cause a change in the conditions of employment, courts are directed to take a totality of circumstances approach in their consideration of the conduct's frequency and severity; "whether it is physically threatening or humiliating, or a mere offensive utterance;" and whether

the conduct imposes an unreasonable interference upon Mr. Henry's work performance. *Id.* (quoting *Harris*, 510 U.S. at 23). Here, Mr. Henry's claims fail the "severe and pervasive" test.

Although Mr. Henry worked at the Bank since 2004 and held a management position since 2008, his claims of harassment were not manifest until sometime after the Bank announced its decision to close the Nashville branch in late 2010. Further, the few instances cited *supra* at p. 7 are of a garden variety rather than extreme or severe. While these acts may be subjectively viewed as humiliating or offensive, they were isolated and did not threaten physical harm, either directly or indirectly. At most, any perceived harassment simply acted to "engender[] offensive feelings in" Mr. Henry rather than to shift the conditions of Mr. Henry's work environment. *Faragher*, 524 U.S. at 787 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)).

In sum, no reasonable juror could objectively draw a causal connection between the conduct of Mr. Henry's co-workers and his faith. Further, the conduct alleged by Mr. Henry was not severe and pervasive. Thus, Mr. Henry has failed to make out a *prima facie* case of religious discrimination. As such, there being no dispute as to any material fact, the Bank is entitled to judgment as a matter of law on this claim.

## B. PLAINTIFF'S RETALIATION CLAIM

Title VII prohibits discrimination against an employee "because he has made a charge" against his employer. 42 U.S.C. § 2000e-3(a). To establish claims of retaliation, Mr. Henry must demonstrate "that: (1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known; (3) thereafter, the defendant took an employment action adverse to [Mr. Henry]; and (4) there was a causal connection between the protected activity and the adverse employment action." *Warf v. U.S. Dept. of Veterans Affairs*, 713 F.3d 874, 880 (6th Cir. 2013) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000) (internal quotations

omitted)). In Mr. Henry's case, the parties concede that Mr. Henry's EEOC claims are protected activity, those claims were pending before the EEOC when he was separated from service with the Bank, and that the Bank was aware of those charges. There is disagreement, however, as to whether the Bank's conduct of Mr. Henry's severance was a materially adverse employment action and whether there is a causal connection between any adverse action and Mr. Henry's exercise of protected activity.

According to the Bank, "[a] materially adverse employment action must generally 'inflict direct economic harm.'" (Defendant's Motion for Summary Judgment, DE 30-2, p. 18) (quoting *Freeman v. Potter*, 200 Fed. Appx. 439, 442 (6th Cir. 2006)). Here, the Bank asserts that because "Mr. Henry received full pay and benefits for the entire period that he was out of work up to and including" the date of the Nashville branch's closure, Mr. Henry cannot establish a "direct economic harm." Further, the Bank argues that the decision to involuntarily separate Mr. Henry from service was made in January of 2011 well ahead of his exercise of any activities protected by Title VII. As such, Mr. Henry's claim must fail. While, on these facts, no reasonable juror could find that the acceleration in Mr. Henry's separation date was materially adverse, the acceleration of Mr. Henry's separation is not the only action taken by the Bank that can constitute an adverse action in violation of Title VII's anti-retaliation provision.

In *EEOC v. Sundance Rehab. Corp.*, 466 F.3d 490, 502 (6th Cir. 2006), the United States Court of Appeals for the Sixth Circuit considered similar claims to those presented here. At issue in *Sundance* was an offer of severance pay conditioned upon a waiver of rights to pursue future claims, either with the EEOC or individually, after the date of separation. *Id.* at 492-93. According to the EEOC, such provisions have "a chilling effect [that impermissibly] undermines the Commission's ability to enforce [Title VII]," *Id.* at 494, and are an obvious "preemptive

strike against future protected activity." *Id.* at 497. Central to the EEOC's argument was the holding in *EEOC v. Bd. Of Governors of State Colls. and Univs.*, 957 F.2d 424 (7th Cir. 1992), where the EEOC successfully pressed claims similar to those presented here in regard to an individual who was denied the arbitration provision of a collective bargaining agreement after filing a complaint with the EEOC. *Sundance*, 466 F.3d at 497.

While the *Sundance* court agreed that the facts presented in *Bd. of Governors* established facially retaliatory conduct, *Id.* at 498, it disagreed with the proposition that simply conditioning severance benefits on a waiver of rights to pursue protected activity was facially retaliatory. What distinguished *Bd. of Governors* from the claims presented in *Sundance* was the right to arbitration denied the *Bd. of Governors* plaintiff that was "part and parcel of the employment relationship." *Id.* at 497-98 (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 65 (1984)). According to the Sundance court, "employees of SunDance [were not] deprived of anything by the offering of the Separation Agreement. Those who [chose] to accept it [were] better off, by receiving a benefit that was not 'part and parcel of the employment relationship.'" *Id.* at 501. Under this same reasoning, the court found that the EEOC's had failed to establish a *prima facie* case for retaliation. *Id.* at 501-03. Under this same reasoning, however, Mr. Henry has successfully established *at least* a *prima facie* case of retaliation and likely a claim of *per se* or facial retaliation.

In a light most favorable to Mr. Henry, the record reflects that the Bank "finalized its plan for [his] involuntary separation" from the Bank's employ in January of 2011. (Defendant's M., DE 30-2, p. 4.) That plan included "the customary benefits provided by the Bank's Involuntary Separation Policy." (Federal Reserve Bank Memorandum of January 26 2011 ("Memo"), DE 36, p. 1.) Further, in order to "continue to operate efficiently and within an effective control

environment and [maintain] the physical security of the building," the Bank's Board of Governors had approved "a minimum of six months' severance pay to all staff within the impacted areas." (Memo at p. 1.) Thus, unlike the plaintiff in *SunDance*, severance pay was a "part and parcel of the employment relationship" when the Bank decided to separate Mr. Henry from service early. The Bank concedes that the severance package offered to Mr. Henry on May 31, 2011, conditioned his severance pay upon his "waive[r of] his rights to recover money from a Title VII Civil Rights Act" claim and that Mr. Henry has not been paid *any* severance pay. (PSMF, DE 37-2, p. 25 ¶ 68.) Thus, Mr. Henry has alleged an adverse employment act taken in connection with his exercise of protected activity; establishing a *prima facie* case of retaliation under Title VII. As such, a triable issue remains and summary judgment for the Bank is improper.

The Court notes that the Bank was extremely careful in its attempt to avoid these charges. The fact that the Bank structured Mr. Henry's separation just as if he were terminated on July 31, 2011 is ample evidence of that fact. However, it is beyond the Court's comprehension how the Bank concluded that it could alter the terms of Mr. Henry's employment and separation through conditioning his severance pay on a waiver of his rights to collect financially should his EEOC claims be substantiated. While the Bank's "refusal to pay [Mr. Henry] severance pay that [he] was *otherwise not due or promised* when [he] did not sign the waiver" would have avoided liability for retaliation, the Bank's conduct here left Mr. Henry worse off than he was prior to receiving the Bank's revised offer of severance pay. *Sundance*, 466 F.3d at 502. As such, even in a light most favorable to the Bank, the undisputed facts established here align this case with *Bd. of Governors* and *EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085 (5th Cir. 1987); likely establishing a *per se* act of retaliation in violation of Title VII.

The Bank will be Ordered to Show Cause why: 1) its attempt to secure a waiver of Mr. Henry's right to recover financially under Title VII at the expense of his severance pay is not a *per se* act of retaliation, and 2) why the Court should not grant Judgment in favor of Mr. Henry *sua sponte* on the undisputed facts presented here. *See Employers Ins. Of Wausau v. Petroleum Specialties*, 69 F.3d 90, 105 (6th Cir. 1993) (noting that "district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the party was on notice that he had to come forward with all of [his] evidence.").

## IV.    CONCLUSION

For the foregoing reasons, the Bank's motion for summary judgment as to Mr. Henry's claims of religious discrimination will be **GRANTED** and those claims will be **DISMISSED** with prejudice. The Bank's motion for summary judgment as to Mr. Henry's retaliation claims will be **DENIED**. Further, because the Bank's conduct appears to constitute a *per se* act of retaliation, a separate **ORDER** will enter requiring the Bank to **SHOW CAUSE** why the Court should not grant judgment in favor of Mr. Henry on his retaliation claim, and, if so, what damages would be available to him.

/s/Joe B. Brown
Joe B. Brown
Magistrate Judge